Rebecca K. Smith
Public Interest Defense Center, P.C.
P.O. Box 7584
Missoula, MT 59807
(406) 531-8133
publicdefense@gmail.com

Timothy M. Bechtold
Bechtold Law Firm, PLLC
P.O. Box 7051
Missoula, MT 59807
(406) 721-1435
tim@bechtoldlaw.net

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES, NATIVE ECOSYSTEMS COUNCIL,<br><br>     Plaintiffs,<br><br>vs.<br><br>KIRSTEN KAISER, District Ranger, Kootenai National Forest, Three Rivers Ranger District; CHAD BENSON, Forest Supervisor, Kootenai National Forest; KEITH LANNOM, Deputy Regional Forester, U.S. Forest Service Region One; U.S. FOREST SERVICE.<br><br>     Defendants. | CV-23-<br><br>COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF |

# I. INTRODUCTION

1.  This is a civil action for judicial review under the Administrative Procedure Act of the U.S. Forest Service's authorizations and/or lack thereof regarding the Black Ram Project (Project) on the Kootenai National Forest (Forest).

2.  Plaintiffs attest that Defendants' conduct is arbitrary and capricious, an abuse of discretion, and/or otherwise not in accordance with law.

3.  Defendants' approval of the Project violates the National Environmental Policy Act (NEPA), 42 U.S.C. §4331 et seq., the National Forest Management Act (NFMA), 16 U.S.C. §1600 et seq., and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701 et seq.

4.  Plaintiffs seek a declaratory judgment, injunctive relief, the award of costs, and expenses of suit, including attorney and expert witness fees pursuant to the Equal Access to Justice Act, 28 U.S.C. §2412, and/or such other relief as this Court deems just and proper.

# II. JURISDICTION

5.  This action arises under the laws of the United States and involves the United States as a Defendant. Therefore, this Court has subject matter jurisdiction over the claims specified in this Complaint pursuant to 28 U.S.C. §§ 1331, 1346.

6.  An actual controversy exists between Plaintiffs and Defendants. Plaintiffs'

members use and enjoy the Forest for hiking, fishing, hunting, camping, photographing scenery and wildlife, and engaging in other vocational, scientific, spiritual, and recreational activities. Plaintiffs' members intend to continue to use and enjoy the area frequently and on an ongoing basis in the future.

7. The aesthetic, recreational, scientific, spiritual, and educational interests of Plaintiffs' members have been and will be adversely affected and irreparably injured if Defendants implement the Project. These are actual, concrete injuries caused by Defendants' failure to comply with mandatory duties under NFMA, NEPA, and the APA. The requested relief would redress these injuries and this Court has the authority to grant Plaintiffs' requested relief under 28 U.S.C. §§ 2201 & 2202, 5 U.S.C. §§ 705 & 706.

8. Plaintiffs fully participated in the available administrative review processes for the Project; thus they exhausted administrative remedies. Therefore, the Court has jurisdiction to review Plaintiffs' claims.

## III. VENUE

9. Venue in this case is proper under 28 U.S.C. §1391(e) and Local Rule 3.2(b). Defendants Kaiser and Benson reside in Lincoln County and Defendant Lannom resides in Missoula County, which are all within the Missoula Division of the United States District Court for the District of

Montana.

## IV. PARTIES

10. Plaintiff ALLIANCE FOR THE WILD ROCKIES is a tax-exempt, non-profit public interest organization dedicated to the protection and preservation of the native biodiversity of the Northern Rockies Bioregion, its native plant, fish, and animal life, and its naturally functioning ecosystems. Its registered office is located in Missoula, Montana. The Alliance has over 2,000 individual members, many of whom are located in Montana. Members of the Alliance observe, enjoy, and appreciate Montana's native wildlife, water quality, and terrestrial habitat quality, and expect to continue to do so in the future, including in the Project area. Alliance's members' professional and recreational activities are directly affected by Defendants' failure to perform their lawful duty to protect and conserve these ecosystems. Alliance for the Wild Rockies brings this action on its own behalf and on behalf of its adversely affected members.

11. Plaintiff NATIVE ECOSYSTEMS COUNCIL is a non-profit Montana corporation with its principal place of business in Three Forks, Montana. Native Ecosystems Council is dedicated to the conservation of wildlife and natural resources on public lands in the Northern Rockies. Its members observe, enjoy, and appreciate Montana's native wildlife, water quality, and

terrestrial habitat quality, and expect to continue to do so in the future, including in the Project area. Its members' professional and recreational activities are directly affected by Defendants' failure to perform their duties. Native Ecosystems Council brings this action on its own behalf and on behalf of its adversely affected members.

12. Defendant KEITH LANNOM is the Deputy Regional Forester for Region One/Northern Region of the U.S. Forest Service, and is the decision-maker who denied the administrative objection filed against the Project.

13. Defendant CHAD BENSON is the Forest Supervisor of the Kootenai National Forest, and is the official who signed the Project decision.

14. Defendant KIRSTEN KAISER is the District Ranger on the Three Rivers Ranger District of the Kootenai National Forest where the Project will occur.

15. Defendant UNITED STATES FOREST SERVICE (USFS) is an administrative agency within the U.S. Department of Agriculture, and is responsible for the lawful management of National Forests, including the Kootenai National Forest.

## V. FACTUAL ALLEGATIONS

**A.   Project and Project Area**

16. The Project is located in Lincoln County, Montana, approximately 20 miles

north of Troy, Montana.

17. The Project area is 95,412 acres (149 square miles), which includes 91,647 acres (143 square miles) of National Forest lands.

18. The Canadian border is the northern boundary of the Project, and the Yaak River is the southern boundary of the Project.

19. The unincorporated community of Yaak, Montana is located on the southern boundary of the Project.

20. The western boundary of the Project area is the Ranger District boundary and the western boundary of Pete Creek watershed.

21. The eastern boundary of the Project area is the Wood Mountain/ Grubstake ridgeline.

22. The legal description of the Project Area includes all or portions of Townships 36 and 37 North, Ranges 30, 31, 32, and 33 West, Lincoln County, Montana.

23. There are two Inventoried Roadless Areas in the Project area: West Fork Yaak (# 694) and Northwest Peaks  (#663).

24. The Project Environmental Assessment (EA) represents that 23,846 acres of the Project area fall within the "Wildland Urban Interface," however the EA relies on a definition created by Lincoln County, rather than the legally-binding definition found in the Forest Plan.  Thus, it is unclear how many

acres in the Project area fall within "wildland urban interface" as defined by the Forest Plan.

25.    The Project includes the following:

    a.    2,442 acres of "regeneration" logging, i.e. clearcutting or modified clearcutting;

    b.    1,460 acres of additional commercial logging;

    c.    618 acres of precommercial thinning;

    d.    76 acres of clearing "fuel breaks;"

    e.    7,034 acres of prescribed burning outside logging units; and

    f.    519 acres of tree slashing outside logging units.

26.    The Project allows 579 acres of logging in designated old growth forest, and 123 acres of logging in "recruitment" old growth forest.

27.    The Project allows slashing and/or burning in an additional 343 acres of designated old growth forest, and 318 acres of "recruitment" old growth forest.

28.    The Project allows 2,199 acres of slashing and/or burning in the Northwest Peaks and West Fork Yaak Inventoried Roadless Areas.

29.    The Project Decision Notice (Decision) represents that 1,485 acres of logging and 2,883 acres of slashing and/or burning will take place in the "Wildland Urban Interface."  As noted above, however, the Forest Service

is not using the Forest Plan definition of "wildland urban interface,"
therefore it is unclear how many acres of activities will take place in the
wildland urban interface as defined in the Forest Plan.

30.   Access to Project units would occur on open, gated, barriered, or newly
constructed roads.

31.   The Project authorizes 3.3 miles of new permanent road construction.

32.   The Project authorizes 0.2 miles of temporary road construction.

33.   The Project authorizes road reconstruction on 90.3 miles.

34.   Road reconstruction may occur on existing open roads, existing gated roads,
and "previously barriered" roads.

35.   The Project allows both the "use of gated routes beyond administrative use
levels" and the "reconstruction and use of previously barriered routes[.]"

36.   The Project EA does not disclose the mileage of Project roads that will
receive "use of gated routes beyond administrative use levels[.]"

37.   The Project EA does not disclose the specific mileage of "reconstruction
and use of previously barriered routes[.]"

38.   The Project promises to "block" 32.0 miles of existing National Forest
System Roads as "road storage" to provide for "in-kind" grizzly bear core
habitat replacement.  Of these roads, at least 25.6 miles of roads will not
have the culverts removed.

39.   The Project promises to "block[] the entrance" for 20.0 miles of existing system roads in order to "decommission" the roads and "remove[]" those roads "from the system."  The majority of these roads – 13.92 miles –  have a prescription to leave culverts in place.

40.   "Undetermined" roads are roads that are not authorized as National Forest System Roads but rather are "road prisms that exist on the landscape from previous management activities or were illegally created," i.e. unauthorized roads.

41.   The Project promises to "block[] the entrance" for 3.0 miles of unauthorized "undetermined" roads in order to "decommission" the roads.

42.   The Project authorizes the addition of 2.0  miles of unauthorized "undetermined" roads into the system.

43.   The Project does not include any Forest Plan amendments.

44.   The Forest Service estimates that the Project will take 10 years to implement.

**B.    Procedural Background**

45.   The Scoping Notice for the Project was issued in July 2018.

46.   The Forest Service issued versions of the Project EA in July 2019, December 2019, and June 2022.

47.   The Forest Service first issued a draft Decision Notice in December 2019.

48.   On February 18, 2020, the Forest Service withdrew the draft Decision Notice, and canceled the administrative objection period for the Project.

49.   On September 16, 2020, the Forest Service issued a Biological Assessment for the Project.

50.   On September 28, 2020, the Forest Service reissued a draft Decision Notice for the Project.

51.   On September 15, 2021, FWS issued a Biological Opinion and Letter of Concurrence for the Project.

52.   On June 21, 2022, the Forest Service signed the final Decision Notice for the Project.

53.   The June 2022 Decision Notice chooses Alternative 2 from the Project EA.

54.   The June 2022 Decision Notice states: "the project may begin immediately."

55.   The Forest Service did not begin the Project immediately; as of the filing of this Complaint in January 2023, the Project has not commenced.

**C.   Cabinet-Yaak Grizzly Bears**

56.   The Project area is within the Cabinet-Yaak Grizzly Recovery Zone.

57.   The Project area is within grizzly "Bear Management Units" 14 and 15, which are also referred to as "Northwest Peak" and "Garver," respectively.

58.   Northwest Peak includes the northwest corner of Montana and northeast corner of Idaho; Garver is adjacent to Northwest Peak to the east and is

entirely within Montana. Both Bear Management Units border British Columbia, Canada.

59.   Nearly all of Northwest Peak is Management Situation 1 habitat for grizzly bears.

60.   86% of Garver is Management Situation 1 habitat for grizzly bears.

61.   The Cabinet-Yaak grizzly population is imperiled.

62.   The most recent population count for this population is **42 individuals** (45 bears counted less 3 known to be dead), which was disclosed to the public on October 11, 2022 in the U.S. Fish & Wildlife Service's 2021 monitoring report.

63.   The Forest Service has included the October 11, 2022 monitoring report for the 2021 bear year in the administrative record for this lawsuit.

64.   The 2021 monitoring report states: "We provide data leading up to and including 2020; 2021 sample results have not been completed by the laboratory."

65.   The 2020 monitoring report (released in 2021 and addressing data up to and including 2019) disclosed a population count of **45 individuals** (50 bears counted less 5 known to be dead).

66.   The 2019 monitoring report (released in 2020 and addressing data up to and including 2018) disclosed a population count of **50 individuals** (54 bears

counted less 4 known or assumed dead).

67.   The 2018 monitoring report (released in 2019 and addressing data up to and

including 2017) disclosed a population count of **54 individuals** .

68.   In sum, the past four monitoring reports disclose the following population

counts:

| Year | Bear Count | Comparison to Prior Year |
|---|---|---|
| 2020 Data | 42 | Decrease |
| 2019 Data | 45 | Decrease |
| 2018 Data | 50 | Decrease |
| 2017 Data | 54 | N/A |

69.   In the section of the June 2022 Project EA entitled "Existing Condition," the

Forest Service discloses a population estimate from 2017 – i.e. five years

ago – and represents that the population is purportedly 55-60 individuals

with a 73% probability that the population was stable or increasing.

70.   In the section of the June 2022 Project EA that addresses bear mortality, the

Project EA only discloses mortalities from 2017 and 2018.

71.   The monitoring report released October 11, 2022 disclosed three female

mortalities in the U.S. in the six-year monitoring period 2016 - 2021.

72.   However, on October 17, 2022, in a powerpoint presentation to a Forest

Service collaborative group, the U.S. Fish & Wildlife Service disclosed the fact that three additional female mortalities, and one additional male mortality, had occurred in 2022, as of October 17, 2022:



73. According to published, peer-reviewed scientific literature, Kendall et al (2016), three Cabinet-Yaak grizzly female mortalities in a single year will likely result in a population decline.

74. The Cabinet-Yaak grizzly population is failing every recovery target and goal: it is failing the target for females with cubs; it is failing the target for distribution of females with cubs; it is failing the female mortality limit (which is 0 mortalities until a minimum of 100 bears is reached); and it is failing the mortality limit for all bears (also 0 mortalities until a minimum of 100 bears is reached).

75.   A peer-reviewed published study (Kendall et al. (2016)) on the Cabinet-Yaak grizzly bear found: "Estimated grizzly bear abundance (all sex and age classes) in the CYE in 2012 was 48-50 bears, approximately half the population recovery goal."

76.   The study further finds: "Grizzly bear density in the CYE (4.3-4.5 grizzly bears/1,000 $km^2$) was among the lowest of interior North American populations. The sizes of the Cabinet (n = 22-24) and Yaak (n =18-22) populations were similar."

77.   Further: "The 2 populations in the CYE were demographically and reproductively isolated from each other and the Cabinet population was highly inbred."

78.   Thus, "the small size, isolation, and inbreeding documented by this study demonstrate the need for comprehensive management designed to support CYE population growth and increased connectivity and gene flow with other populations."

79.   The study further finds: "In the small Cabinet and Yaak populations, the difference between growth and decline is 1 or 2 adult females being killed annually or not."

80.   As noted by Dr. David Mattson, a preeminent grizzly bear research scientist in Montana, "the entire corpus of research produced on viability of isolated

or semi-isolated populations of bears and other large long-lived mammals shows that populations of 50-100 animals are acutely vulnerable to extinction (50-95% likely) over a relatively short period of time (100 years or less; e.g., Samson et al. [1985], Shaffer & Samson [1985], Suchy et al. [1985], Wiegand et al. [1998], Howe et al. [2007], McLellan [2020])."

81.   Thus, "an increased loss of even 1 adult female bear every 2-5 years can dramatically escalate risks of population extirpation, a point that has been emphasized in research on viability of bear populations (Suchy et al. 1985, Sæther et al. 1998)."

82.   As Dr. Mattson further notes: "Wilderness Areas and Inventoried Roadless Areas where road access is not allowed comprise around 56% of the [Northern Continental Divide Ecosystem] and [Greater Yellowstone Ecosystem].  In the Cabinet-Yaak Ecosystem this figure is less than half as much, nearer 21%. This difference alone can explain much of the corresponding difference in fates of grizzly bear populations. Despite these telling differences in fates and trajectories of grizzly bear populations, the road density and habitat security standards applied by the Kootenai National Forest are more lax, not less, than those applied on the Flathead National Forest."

83.   In January 2021, FWS produced its Species Status Assessment for grizzly

14

bears. The assessment concludes that the Cabinet-Yaak grizzly population has "low" resiliency, which means a low ability for populations to persist in the face of stochastic events, or for populations to recover from years with low reproduction or reduced survival.

84. The Species Status Assessment finds that the only circumstance under which this population would increase to "high" resiliency would be with a significant increase in conservation measures.

85. The Project is "likely to adversely affect" the Cabinet-Yaak grizzly bear.

86. The Project will likely cause "incidental take" of Cabinet-Yaak grizzly bears: "any female grizzly bears that use [Bear Management Unit]s 14 and 15 during the Black Ram Project may experience some level of harm resulting in incidental take."

87. In the June 2022 Project EA, without supporting citations, the Forest Service represents:

> In the Cabinet-Yaak Recovery Zone, projects and motorized access management have been implemented, education instituted, and bear numbers have been increasing and with increasing confidence. Generally, the distances between existing attributes and those of the recovery criteria has decreased. . . . Operating under the same [Interagency Grizzly Bear Committee] guidelines and with the same activities occurring, it is evident in the Cabinet-Yaak Recovery Zone and on the Kootenai National Forest that Forest Service activities under this framework have been successful at supporting recovery.

88.   In the June 2022 Project Decision, the Forest Service relies on a September 2021 representation by the U.S. Fish & Wildlife Service that "[t]he best information indicates the overall status of the [Cabinet-Yaak Ecosystem] grizzly bear population is stable to increasing."

89.   The September 2021 representation by the U.S. Fish & Wildlife Service that that "[t]he best information indicates the overall status of the [Cabinet-Yaak Ecosystem]  grizzly bear population is stable to increasing" cites to a 2020 monitoring report, which relies on data up to and including 2019.

90.   The September 2021 representation by the U.S. Fish & Wildlife Service that "[t]he best information indicates the overall status of the [Cabinet-Yaak Ecosystem] grizzly bear population is stable to increasing" does not consider mortality data from 2020, 2021, or 2022.

**D.**   **Roads**

91.   There are 408 miles of existing National Forest System Roads in the Project Area, which equates to a road density of 2.9 miles/square mile.

92.   In terms of all of the human uses that affect grizzly bears, the U.S. Fish & Wildlife Service  has long found: "[r]oads probably pose the most imminent threat to grizzly habitat today []. The management of roads is one of the most powerful tools available to balance the needs of people with the needs of bears."

93.   Roads pose a threat to grizzly bears because roads provide humans with access into grizzly bear habitat, which leads to direct bear mortality from accidental shootings and intentional poachings.

94.   Human access also leads to indirect bear mortality by creating circumstances in which bears become habituated to human food and are later killed by wildlife managers.

95.   Roads and human access also result in indirect mortality by displacing grizzly bears from good habitat into areas that provide sub-optimal habitat conditions.

96.   Displacement may have long term effects: "Females who have learned to avoid roads may also teach their cubs to avoid roads. In this way, learned avoidance behavior can persist for several generations of bears before they again utilize habitat associated with closed roads."

97.   Grizzly bears are displaced from open and closed roads: "grizzlies avoided roaded areas even where existing roads were officially closed to public use[]. Females with cubs remained primarily in high, rocky, marginal habitat far from roads. Avoidance behavior by bears of illegal vehicular traffic, foot traffic, and/or authorized use behind road closures may account for the lack of use of areas near roads by female grizzly bears in this area. This research demonstrated that a significant portion of the habitat in the study area

apparently remained unused by female grizzlies for several years. Since

adult females are the most important segment of the population, this lack of

use of both open-roaded and closed-roaded areas is significant to the

population."

98.   Displacement may negatively impact the survival rates of grizzly cubs:

"survivorship of the offspring of females that lived in unroaded, high

elevation habitat was lower than that recorded in other study areas in the

[Northern Continental Divide Ecosystem]. The majority of this mortality

was due to natural factors related to the dangers of living in steep, rocky

habitats. This is important in that the effects of road avoidance may result

not only in higher mortality along roads and in avoidance of and lack of use

of the resources along roads, but in the survival of young when their

mothers are forced to live in less favorable areas away from roads."

99.   The Grizzly Bear Recovery Plan finds that "[t]imber management programs

may negatively affect grizzly bears by (1) removing thermal, resting, and

security cover; (2) displacement from habitat during the logging period; and

(3) increases in human/ grizzly bear confrontation potential or disturbance

factors as a result of road building and management. New roads into

formerly unroaded areas may cause bears to abandon the area."

E.     **Illegals Roads & Ineffective Barriers**

100.  On July 23, 2021, Yaak Valley Forest Council (Yaak Valley) informed the

       Forest Service that "based on field reviews conducted on July 22, 2021, . . .

       the Forest Service's efforts to limit unauthorized use are ineffective at

       halting motor vehicle trespass, contradicting the commitments made in both

       the EA and [Biological Assessment]. [Yaak Valley's] survey within the

       Black Ram project area found evidence that [] motor vehicle use continues

       on 5821, 92, 5835, 5839, 276, 5857, 5860, 5890, 5892, 5886A, 5886, 5856,

       748, 338P, 338R, 5895, 5894, 747, and 6134 closed routes within the Black

       Ram project area, including on routes where gates and other structures have

       failed to prevent such use, and including on routes that the Council found

       unauthorized use occurring in 2020 that the Forest Service apparently never

       fixed."

101.  Yaak Valley documented the following ineffective barriers and instances of

       illegal motorized use in 2020 and again on July 22, 2021 in the Project area:


//


//


19

| Site | Yaak Valley Forest Council Photo (July 22, 2021) | Forest Service Photo (July or August 2021) |
|------|---------------------------------------------------|--------------------------------------------|
| BR-1 | <br><br>User-created bypass with an 8-foot cleared opening to the left of the gate | |
| BR-2 | <br><br>Newly-installed berm can be bypassed to the left and right | |



| BR-3 | 5-foot opening to the left of gate with tire tracks behind the gate on the road bed |
| BR-4 | Tire ruts allow motorized use passage to the left of the berm |
| BR-5 | 4-foot wide passage to the left of the berm with visible tire tracks |



| BR-6 | User-created road with no barrier | |
| BR-7 | 3.5-foot wide passage to the right of the berm | |
| BR-8 | Shallow berm is ineffective and road is frequently traveled. | No Forest Service photo provided. Forest Service Report states: "This route is barriered (MVUM) but we consider it open for bear management unit assessment due to use." |

| | | |
|---|---|---|
| BR-10 | <br><br>User-created road with ineffective barrier. | No Forest Service photo provided.  Forest Service Report states: "We documented this route this year. Unauthorized use is illegal regardless of terrain." |
| BR-9 | <br><br>User-created road with ineffective barrier. | No Forest Service photo provided.  Forest Service Report states: "We documented this route this year. Unauthorized use is illegal regardless of terrain." |
| BR-11 | <br><br>Motor vehicle passage to right of berm with sign broken from being driven over | |



| BR-12 | Newly-installed berm can be bypassed to the left and right. | |
| BR-13 | Motor vehicle passage to the right of the gate. | |



| BR-14 | 5-foot wide passage to the right of the berm allows motorized access into grizzly core. | |
|---|---|---|
| BR-15 | Ineffective barrier | |

| BR-16 | No barrier after fallen trees removed; motor vehicle tracks present | |
| --- | --- | --- |
| BR-17 | No barrier and not mapped as an open road. | |
| BR-18 | 5-foot wide passage to the right of the gate | |



| BR-19 | | |
|---|---|---|
| | 3.5-foot wide passage through the berm to the right | |
| BR-20 | | |
| | 3-foot wide passage to the left of the gate | |

102.   In its October 2021 response to Yaak Valley's report on ineffective barriers and illegal road use, the Forest Service excluded Yaak Valley's July 22, 2021 photos and observations showing that all of the problems still remain, and only included Yaak Valley's 2020 photos.

103.   Additionally, as shown in the table above, the Forest Service responded to Yaak Valley's report with agency photos, primarily dated July and August

2021, that in some cases have been taken from a different angle in order to obscure the full extent of the openings still being used/and or available to motorized vehicles.

104.  Additionally, in response to Yaak Valley's report, for several of the illegal routes, the Forest Service first states that it was "[u]naware of this purported route . . ." in 2020, but then it concedes that "[w]e documented this route this year," i.e. in 2021.  No action was taken in response to this known illegal road use, and instead the Forest Service simply states: "Unauthorized use is illegal regardless of terrain."

105.  In response to Yaak Valley's report, it appears that the Forest Service added two berms – at "BR-2" and "BR-12."

106.  As noted above, the new berms at BR-2 and BR-12 can be driven around.

107.  Neither the Project Decision nor the Project EA discloses to the public any of these 20 instances of known ineffective barriers and/or illegal user-created roads in the Project area.

108.  Yaak Valley completed additional surveys on September 30, 2021 and October 1, 2021, including many of the locations above, and documented 15 ineffective berms, 17 ineffective gates, and 13 roads with no gate or berm.

109.   The photographs below document 15 berms with established trails around the berm:



110.   Despite the established trails around these berms that provide motorized access to motorcycles and/or ATVs, the Forest Service represents that these berms are "functional."

111.   The photographs below document 17 ineffective gates with openings around

the gate that allows motorcycle and/or ATV use:



112.   Despite the openings around these gates that provide motorized access to

motorcycles and/or ATVs, the Forest Service represents that these gates are

"functional."

113.   The photographs below document 13 roads with no gate or berm:



114.   Despite the lack of berm or gate, the Forest Service represents that these

"closures" are "functional."

115.   Neither the Project Decision nor the Project EA discloses to the public any

of these 45 instances of ineffective barriers, ineffective gates, and/or

missing gates/berms.

116.    Neither the Project Decision nor the Project EA discloses to the public the

actual results of Forest-wide annual monitoring of road closure

effectiveness from the "Annual Compliance Monitoring Final Summary

Report."

117.    For example, during 2020, in the Kootenai National Forest, the Forest

Service found 32 breached barriers and repaired none of them (0%).

118.    Additionally, during 2020, in the Kootenai National Forest, the Forest

Service found 40 breached gates and repaired only 9 of the breached gates

(24%).

119.    In sum, during 2020, in the Kootenai National Forest, 22% of the monitored

barriers and gates had been breached, i.e. one out of five barriers and gates

were breached.  This statistic is not disclosed to the public anywhere in the

Project EA or Decision.

120.    Additionally, in sum, during 2020, in the Kootenai National Forest, only

23% of the breached barriers and gates were actually repaired, i.e. one out

of five breached barriers and gates were actually repaired.  This statistic is

not disclosed to the public anywhere in the Project EA.

121.    Instead of disclosing actual and available Project-area and/or Forest-wide

monitoring data to the public, the Project EA provides one boilerplate and

demonstrably false paragraph:

> In the past, we have noted unauthorized use of restricted roads, and occasionally an unauthorized, user-created road is discovered. The District has made repairs for any such breaches as quickly as possible after discovery. The annual Adopt-A-Road event, which has occurred for the last 25 years, meets our monitoring requirement from the 2015 Forest Plan and helps us identify needed road or barrier repairs. By making needed repairs, we continue to maintain the associated BMUs' standards for core and motorized route densities.  Monitoring of road closures occurs daily or weekly by employees working and driving on forest roads across the District as well as the project area.

## F.    Access Amendment

122.   The Forest Plan Access Amendment sets road and motorized trail restrictions in Cabinet-Yaak grizzly bear habitat on National Forest lands.

123.   Within the official "Cabinet-Yaak Grizzly Bear Recovery Zone," the Access Amendment sets specific numeric limits on total motorized route density and open motorized route density, and requires a specific numeric minimum of secure core habitat.

124.   "Open Motorized Route Density" includes open roads, other roads not meeting all restricted or obliterated criteria, and open motorized trails.

125.   "Total Motorized Route Density" includes open roads, restricted roads, roads not meeting all reclaimed criteria, and open motorized trails.

126.   "Core Areas" contain no motorized travel routes or high-use nonmotorized trails during the non-denning season (April 1 to November 30) and are more

than 0.3 miles (500 meters) from a drivable road. Core areas do not include any gated roads but may contain roads *that are impassable* due to vegetation or constructed barriers.

127. Routine forest management may be proposed in a core area block after 10-years of core area benefit. However, Bear Management Units must remain at or above the core standard. Therefore, potential losses to existing core must be compensated with in-kind replacement concurrently or prior to incurring the losses. Following management, core areas must subsequently be managed undisturbed for 10 years.

128. The Northwest Peaks (#14) and Garver (#15) Bear Management Units are first priority management units under the Access Amendment.

129. Northwest Peaks (#14) is 99% National Forest land, and must have no greater than 31% open motorized route density, no greater than 26% total motorized route density, and no less than 55% core. No reductions in existing percentage core are permissible until all Bear Management Units meet their minimum core standard.

130. Garver (#15) is 94% National Forest land, and must have no greater than 33% open motorized route density, no greater than 26% total motorized route density, and no less than 55% core. No reductions in existing percentage core are permissible until all Bear Management Units meet their

minimum core standard.

131.   A document in the administrative record discloses that for the Black Ram
Project analyses, when assessing "permanent" road density and core for the
purposes of comparing existing condition and post-Project condition to
Access Amendment standards, the Forest Service excluded known illegal
road use from the calculations: "The routes used to establish the
'permanent' condition are those that are authorized routes. Unauthorized use
features are not. That is, any user-created routes or access, as well as
breaches (e.g., dismantling or damaging gates and then proceeding to drive
the route) are not considered part of the existing condition."

132.   The Project EA includes a section in the grizzly bear analysis section
entitled "Methodology."  This "Methodology" section does not disclose the
fact that illegal roads – both user-created roads and breaches of existing
roads – were excluded from Access Amendment road density and core
calculations in the Project EA.

133.   The Project EA includes a section in the grizzly bear analysis section
entitled "Assumption and Limitations."  This "Assumptions and
Limitations" section does not disclose the fact that illegal roads – both user-
created roads and breaches of existing roads – were excluded from road
density and core calculations, nor does it disclose the assumption that all

barriers will be 100% effective at preventing motorized use, nor does it disclose the known repeated failures of barriers and user-created roads in this specific Project area, as well as consistently across the Kootenai National Forest.

134. Without disclosing the exclusion of user-created and breached roads, the Project EA represents the following existing conditions:

| Table 84. Established BMU Standards and Existing Measures for BMUs 14 and 15 (values are all in percent). | | | |
|---|---|---|---|
| **BMU** | **OMRD (standard/existing)** | **TMRD (standard/existing)** | **Core (standard/existing)** |
| 14 - Northwest Peak | 31/28 | 26/24 | 55/56 |
| 15 – Garver | 33/30 | 26/26 | 55/55 |
| OMRD: > 1 mile per square mile; TMRD: > 2 miles per square mile | | | |

135. Without disclosing the exclusion of user-created and breached roads, the Project EA represents the following conditions for open motorized route density before, during, and after the Project:

| Table 87. Expected project impacts to OMRD. | | | | |
|---|---|---|---|---|
| **BMU (Standard %)** | **Existing Condition** | **During – Alt. 2** | **During – Alt.3** | **Post-Project – Alts. 2 and 3** |
| BMU 14 (31) | 28 | 31 | 31 | 28 |
| BMU 15 (33) | 30 | 36* | 36* | 30 |

136. Thus, even with the exclusion of of user-created and breached roads, the Project will exceed the Access Amendment standard of 33% for Garver during Project implementation, with an open motorized route density of 36%.

137. Moreover, although undisclosed to the public in the Project EA, a document in the administrative record indicates that open motorized route density could reach as high as 42% during the Project.

138. Without disclosing the exclusion of user-created and breached roads, the Project EA represents the following conditions for total motorized route density before, during, and after the Project:

| Table 88. Project impacts to TMRD. | | | | |
|---|---|---|---|---|
| BMU (Standard %) | Existing Condition | During Alt. 2 | During Alt. 3 | Post-Project Alts. 2 and 3 |
| BMU 14 (26) | 24 | 26 | 26 | 23 |
| BMU 15 (26) | 26 | 32 | 32 | 26 |

139. Thus, even with the exclusion of of user-created and breached roads, the Project will exceed the Access Amendment standard of 26% for Garver during Project implementation, with a total motorized route density of 32%.

140. Regarding core, the Forest Service plans to remove barriers or gates on 36 road segments to allow motorized access in existing core for the Project. This action will eliminate 4,952 acres of existing core habitat.

141. Core will be reduced in Northwest Peak from 46,854 acres to 44,931 acres

out of 83,030 total acres, which is a reduction from 56% core to 54% core.

142.   The Forest Service proposes to install barriers on roads to create new core areas as "in-kind" replacement of core.  If barriers are 100% effective, new core would total 2,269 acres in Northwest Peak.

143.   Core will be reduced in Garver from 32,434 acres acres to 29,405 acres out of 58,841 total acres, which is a reduction from 55% core to 50% core.

144.   The Forest Service proposes to install barriers on roads to create new core areas as "in-kind" replacement of core.  If barriers are 100% effective, new core would total 3,062 acres in Garver.

**G.  Interagency Grizzly Bear Guidelines**

145.   The Forest Plan mandates: "Elements contained in the most recent 'Interagency Grizzly Bear Guidelines,' or a conservation strategy once a grizzly bear population is delisted, would be applied to management activities."

146.   The most recent Interagency Grizzly Bear Guidelines in the administrative record are from 1986, and for Management Situation 1, they state:

> Grizzly habitat maintenance and improvement . . . and grizzly-human conflict minimization will receive the highest management priority.  Management decisions will favor the needs of the grizzly bear when grizzly habitat and other land use values compete. Land uses which can affect grizzlies and/or their habitat will be made compatible with grizzly needs or such uses will be disallowed or eliminated. Grizzly-human conflicts will be resolved in favor of grizzlies unless the bear

involved is determined to be a nuisance. Nuisance bears may be controlled through either relocation or removal but only if such control would result in a more natural free-ranging grizzly population and all reasonable measures have been taken to protect the bear and/or its habitat (including area closures and/or activity curtailments).

147. One element from the Interagency Grizzly Bear Guidelines states: "Timber sale and fire management EAs will specify agency grizzly management goals and measures to meet them. Contracts will include specific measures to protect, maintain and/or improve grizzly habitat and meet grizzly management goals and objectives. Timber sale contracts will include a clause providing for cancellation or temporary cessation of activities if such are needed to resolve a grizzly-human conflict situation. Contractors' full cooperation in meeting grizzly management goals and objectives will be a condition of their receiving and holding contracts (NP burning)."

148. One element from the Interagency Grizzly Bear Guidelines states: "Logging and/or fire management activities which will adversely affect grizzly bear populations or their habitat will not be permitted. Adverse population effects are population reductions and/or grizzly positive conditioning. Adverse habitat effects are reductions in habitat quantity and/or quality (NP burning)."

149. One element from the Interagency Grizzly Bear Guidelines states: "Logging

and burning activities will occur at a time or season when the area is of little or no biological importance to grizzlies. Where winter logging is infeasible, summer logging operations will be restricted in time and space to prevent significant disruptions of normal or expected grizzly activities."

150.  One element from the Interagency Grizzly Bear Guidelines states: "All roads used for timber sale purposes will be single purpose roads only, and will be closed to public use not associated with timber sale operation and administration. Exceptions could be: (a) seasonal closures if data show grizzlies use of the area to be seasonal and the road facilitates other important resource use that would not be possible without the road; (b) roads could be open for short periods, such as for hunting seasons and wood gathering, if human use is of short duration."

151.  One element from the Interagency Grizzly Bear Guidelines states: "The following uses, developments or activities will be evaluated to determine their compatibility with grizzly habitat requirements: (a) proposed roads[.] . . . Existing or proposed activities or uses which will adversely affect grizzly populations and/or their habitat will be terminated, removed, relocated or denied. Adverse population effects are population reductions and/or grizzly positive conditioning. Adverse habitat effects are reductions in habitat quantity and/or quantity."

152. One element from the Interagency Grizzly Bear Guidelines states: "Special care will be taken to assure that trail and road construction does not degrade important grizzly use areas."

153. The Project EA does not disclose any of the foregoing provisions from the Interagency Grizzly Bear Guidelines, nor apply them to the Project area.

## VI. CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

*The Forest Service has failed to demonstrate that the Project complies with Forest Plan standards for grizzly bear – the Access Amendment and Interagency Grizzly Bear Guidelines – in violation of NEPA, NFMA, and the APA.*

154. All previous paragraphs are incorporated by reference.

155. The Forest Plan mandates: "FW-STD-WL-02. The Motorized Access Management within the Selkirk and Cabinet Yaak Grizzly Bear Recovery Zone Management Direction and ROD is included in appendix B, and shall be applied."

156. The Forest Plan mandates: "FW-GDL-WL-15. Grizzly bear. Elements contained in the most recent 'Interagency Grizzly Bear Guidelines,' or a conservation strategy once a grizzly bear population is delisted, would be applied to management activities."

157. The Project EA fails to demonstrate compliance with the Access

Amendment Record of Decision and the Interagency Grizzly Bear Guidelines.

158. Although undisclosed to the public in the Project EA, the Forest Service's calculations in the Project EA for open motorized route density and total motorized route density exclude breached roads and user-created roads. Similarly, the Forest Service's calculations in the Project EA for core fail to exclude breached roads and user-created roads.

159. By failing to disclose the true existing condition and post-project condition of motorized access in the Project area, both the existing condition and post-project condition calculations are inaccurate. Therefore, it is not possible to determine whether the Project complies with the Access Amendment standards for open motorized route density, total motorized route density, and core.

160. Although undisclosed to the public in the Project EA, the Forest Service has documented a 22% failure rate for barriers and gates in the Forest, and the agency has received documentation of dozens of barriers and gates that do not effectively prevent motorized use, as well as roads with no apparent barrier or gate, in the Project area.

161. It is arbitrary and capricious for the agency to assume 100% barrier/gate effectiveness in light of this available information. Moreover, it is not

possible to determine whether the Project complies with the Access

Amendment standards for open motorized route density, total motorized

route density, and core without consideration of the failure rate of

barriers/gates.  In particular, without 100% barrier effectiveness, the Project

will violate the Access Amendment standard for core: the Project reduces

core and proposes "in-kind replacement" of core, but in-kind replacement of

core is only lawful if the routes behind the barriers can "no longer function

as motorized routes."  If a motorcyle can drive over or around a berm, then

that route can still "function as a motorized route" and accordingly cannot

be counted as in-kind core replacement.

162.    The Project EA fails to disclose the elements of the Interagency Grizzly

Bear Guidelines and fails to apply them to the Project.

163.    Additionally, the Project EA and administrative record fail to disclose and

apply the Interagency Grizzly Bear Guidelines Management Situation-1

requirement:  "Management decisions will favor the needs of the grizzly

bear when grizzly habitat and other land use values compete. Land uses

which can affect grizzlies and/or their habitat will be made compatible with

grizzly needs or such uses will be disallowed or eliminated."

164.    The Project does not favor the needs of grizzlies and the Project is not

compatible with the needs of grizzlies because it will adversely affect the

43

Cabinet-Yaak grizzly, cause incidental take of female Cabinet-Yaak grizzlies, and allow a potentially 10-year violation of the 33/26/55 "best available science" road density limits from Wakkinen-Kasworm (1997), which is particularly egregious in light of the facts that the Cabinet-Yaak grizzly population is small (42 bears at last count, although recovery minimum is 100 bears), isolated, inbred, failing all recovery targets, and experiencing extremely high female mortality, and the fact that there are multiple other large-scale logging and road-building projects that are currently harming this population without any honest cumulative effects analysis of how the population is being impacted by all of the current projects in the Cabinet-Yaak Recovery Zone.

165. For these reasons, the Project violates the Forest Plan, in violation of NFMA and the APA, and/or the Forest Service has failed to demonstrate Forest Plan compliance, in violation of NEPA, NFMA, and the APA.

## SECOND CLAIM FOR RELIEF

*The Project EA fails to take a hard look at Project impacts to the imperiled Cabinet-Yaak grizzly population – the Project EA is misleading and impermissibly relies on stale and/or inaccurate data.*

166. All previous paragraphs are incorporated by reference.

167. The Project EA does not take a hard look and fully and fairly disclose and

analyze Project impacts to the imperiled, ESA-listed Cabinet-Yaak grizzly bear.  The most recent data disclosed and relied upon in the Project EA grizzly bear analysis section is from 2018, although the Project EA was issued in June 2022 – thus the Project EA ignores 3 ½ years of available information.  Moreover, the Project EA misleadingly states that the Cabinet-Yaak grizzly bear population is recovering and increasing, which is contrary to the best available information.

168.   The Forest Service's use of stale/inaccurate data and misleading representations in the Project EA violates NEPA and the APA.

### THIRD CLAIM FOR RELIEF

*The Project EA fails to take a hard look at unauthorized motorized use  – illegal roads and ineffective barriers –  and fails to provide adequate analysis of the effectiveness of using barriers and gates as mitigation measures.*

169.   All previous paragraphs are incorporated by reference.

170.   NEPA mandates that an agency must analyze the efficacy of proposed mitigation measures.

171.   The Project EA never evaluates the effectiveness of dirt berms and gates as closure devices on this Forest, or accurately discloses the extent of the problem to the public.  These measures repeatedly fail and thus allow unauthorized motorized access, yet the agency analyzes road density and

core as though all gates and berms will be 100% effective indefinitely.  As

discussed above, members of the public documented dozens of ineffective

closures in the Project area already, and the Forest Service did not fix those

closures to make them effective.  Moreover, the Forest Service itself

documented a 22% failure rate of barriers and gates across the Forest – a

known failure rate that the agency refused to disclose to the public in the

Project EA.

172.  The Forest Service's failure to take a "hard look" at unauthorized motorized

access and ineffective closures, and failure to provide the public with a full

and fair discussion about this issue, in the Project EA violates NEPA and the

APA.

## FOURTH CLAIM FOR RELIEF

*The Forest Service's refusal to prepare a full EIS for the Black Ram Project*

*violates NEPA and the APA.*

173.  All previous paragraphs are incorporated by reference.

174.  An EIS is required under NEPA to examine any "major Federal actions

significantly affecting the quality of the human environment." 42 U.S.C. §

4332(C).

175.  An EIS must be prepared if substantial questions are raised whether a project

may cause significant degradation of some human environmental factor. To

trigger this requirement a plaintiff need not show that significant effects will in fact occur, but raising substantial questions whether a project may have a significant effect is sufficient.

176. The Council on Environmental Quality has adopted regulations governing the implementation of NEPA. In determining whether a federal action requires an EIS because it significantly affects the quality of the human environment, an agency must consider what "significantly" means. The regulations give it two components: context and intensity. 40 C.F.R. § 1508.27. Context refers to the setting in which the proposed action takes place; intensity means "the severity of the impact." *Id.*

177. There are ten severity factors to consider. 40 C.F.R. §1508.27.

178. The Ninth Circuit holds: "one of these factors may be sufficient to require preparation of an EIS in appropriate circumstances." *Ocean Advocs. v. U.S. Army Corps of Engineers*, 402 F.3d 846 (9th Cir. 2005).

179. ADVERSE &/OR CUMULATIVELY SIGNIFICANT IMPACT. The Project will have a cumulatively significant impact on the already-imperiled Cabinet-Yaak grizzly population when all other logging and road-building projects in the Cabinet-Yaak Recovery Zone are considered.

180. ADVERSE EFFECT TO ESA SPECIES. The Project will adversely affect the Cabinet-Yaak grizzly and cause incidental take of female Cabinet-Yaak

grizzlies.

181.   VIOLATION OF ACCESS AMENDMENT & FEDERAL LAWS.  The

Project violates the Forest Plan, NEPA, and the APA.

182.   For these reasons, the Forest Service violated NEPA by refusing to prepare a

full EIS for the Project.

### FIFTH CLAIM FOR RELIEF

*Alternatively, the Forest Service must prepare a supplemental EA for the Project*

*to address the extremely high female grizzly mortalities*

*suffered by the Cabinet-Yaak grizzly population in 2022.*

183.   All previous paragraphs are incorporated by reference.

184.   As noted above, in October 2022, the U.S. Fish and Wildlife Service

disclosed the fact that the Cabinet-Yaak grizzly population had suffered four

mortalities in 2022 – including three female grizzly mortalities.

185.   The conclusions and analyses in the Project EA are premised upon an

assumption that the Cabinet-Yaak grizzly population is increasing and

recovering.

186.   The best available science (Kendall et al (2016)) indicates that a loss of one

or two Cabinet-Yaak grizzly females in a year may result in a declining

population.

187.   The loss of three females in a single year – 2022 – is thus significant new

information and/or a change in circumstances that necessitate a new and

more accurate analysis in the Project EA of the current status of the Cabinet-

Yaak grizzly population and how this logging and roading project in the

Cabinet-Yaak Grizzly Recovery Zone – which will violate the "best

available science" 33/26/55 road limits for potentially 10 years –  will likely

impact this imperiled population.

188.   The Forest Service's failure to prepare a supplemental EA violates NEPA

and the APA.

## VII. RELIEF REQUESTED

For all of the above-stated reasons, Plaintiffs request that this Court award the

following relief:

A.   Declare that the Project violates the law;

B.   Either vacate the Project decision or enjoin implementation of the Project;

C.   Award Plaintiffs their costs, expenses, expert witness fees, and reasonable

attorney fees under EAJA; and

D.   Grant Plaintiffs any such further relief as may be just, proper, and equitable.

Respectfully submitted this 6th Day of January, 2023.

*/s/ Rebecca K. Smith*
Rebecca K. Smith
PUBLIC INTEREST DEFENSE CENTER, PC
Timothy M. Bechtold
BECHTOLD LAW FIRM, PLLC
Attorneys for Plaintiffs